Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/16/2021 08:11 AM CDT

Eddy Champion and Fraternal Order of
Police Lodge No. 78, appellants, v.
Hall County, Nebraska,
et al., appellees.
___ N.W.2d ___

Filed April 23, 2021.    No. S-20-481.

1. **Jurisdiction: Appeal and Error.** A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.

2. **Statutes: Appeal and Error.** The right of appeal in this state is purely statutory; unless a statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist.

3. **Judgments: Final Orders: Jurisdiction: Appeal and Error.** Proceedings in error under Neb. Rev. Stat. §§ 25-1901 to 25-1908 (Reissue 2016 & Cum. Supp. 2020) provide a means of judicial review of the judgments and final orders of tribunals exercising judicial functions and inferior in jurisdiction to the district court.

4. **Judgments: Final Orders: Appeal and Error.** A petition in error in the district court to review a judgment or final order of an inferior tribunal is in its nature an independent proceeding having for its purpose the removal of the record from an inferior to a superior tribunal to determine whether the judgment or final order entered is in accordance with the law.

5. **Appeal and Error: Words and Phrases.** A petition in error is the removal of proceedings from one court or tribunal to another for review.

6. **Judgments: Appeal and Error.** A petition in error is designed to review the decision of the inferior tribunal and is not to act as a super legislative or administrative agency to come to an independent conclusion.

7. **Administrative Law.** When exercising rulemaking, administrative agencies act in a quasi-legislative capacity.

8. \_\_\_\_. When administrative agencies are called upon to make factual determinations and thus adjudicate, they act in a quasi-judicial capacity.

9. \_\_\_\_. When any tribunal, board, or officer is required to conduct a hearing and receive evidence, it exercises "judicial functions" in determining questions of fact.

10. \_\_\_\_. If the decision made by any tribunal, board, or officer is purely discretionary after an evaluation of facts, it is a decision of policy or a political decision rather than judicial.

11. **Administrative Law: Words and Phrases.** A function is quasi-judicial when the law, in words or by implication, commits to any officer the duty of looking into facts, and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial.

12. **Administrative Law: Appeal and Error.** The mere act of deciding a question of adjudicative fact after an evidentiary hearing, when the law has not contemplated the entity and any power to exercise judicial functions, does not render any tribunal's, board's, or officer's decision reviewable in district court by petition in error.

13. **Judgments: Final Orders.** Only when the law, by word or implication, authorizes the judicial function will the result of that exercise be either a "judgment rendered" or "final order" for purposes of Neb. Rev. Stat. § 25-1901 (Reissue 2016).

14. **Actions: Words and Phrases.** The term "action" is a comprehensive one, and is applicable to almost any proceeding in a court of justice by which an individual pursues that remedy which the law affords.

15. **Final Orders: Words and Phrases.** A "special proceeding" occurs where the law confers a right and authorizes a special application to a court to enforce the right.

16. **Contracts: Legislature: Administrative Law: Judgments: Final Orders: Jurisdiction: Appeal and Error.** Regardless of whether collective bargaining is generally legislatively authorized, the adjudicatory procedures set forth in a collective bargaining agreement for a committee that was never expressly contemplated by the Legislature do not establish any tribunal, board, or officer inferior in jurisdiction to the district court, which is capable of rendering judgments and final orders in the exercise of judicial functions for purposes of review by petition in error.

Appeal from the District Court for Hall County: John H. Marsh, Judge. Affirmed.

Thomas P. McCarty, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellants.

Ashley H. Connell and Erin Ebeler Rolf, of Woods & Aitken, L.L.P., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.
## I. NATURE OF CASE
The question presented in this appeal is whether a grievance committee of a county with fewer than 150,000 inhabitants exercised "judicial functions" for purposes of the petition in error statute,[1] when, after a hearing involving the presentation of sworn testimony and other evidence, conducted pursuant to procedures in the applicable collective bargaining agreement giving the aggrieved party the right to an evidentiary hearing, the committee decided, under largely undisputed facts, that the managerial and disciplinary rights of the applicable collective bargaining agreement permitted the director of the county department of corrections to exclude a correctional officer from working overtime unarmed transport shifts, as a consequence of a prior disciplinary action removing that officer from transport duty. The district court held that it lacked jurisdiction over the petition in error, because no statute specifically requires an evidentiary hearing before such a grievance committee and the grievance committee decided matters of law concerning the meaning of the collective bargaining agreement rather than matters of disputed fact.

## II. BACKGROUND
Eddy Champion, a corrections officer with the Hall County Department of Corrections (Department), filed a grievance in relation to the denial of overtime working unarmed transport after Champion was subjected to discipline that included the indefinite removal from "transport duty." The parties

---

[1] Neb. Rev. Stat. § 25-1901 (Reissue 2016).

followed the grievance procedures set forth as part of a collective bargaining agreement between the Department, as the employer, and the Fraternal Order of Police Lodge No. 78 (FOP), as representative of employee correctional officers and corporals of the Department. The collective bargaining agreement was signed by the president of the FOP and the chairperson of the Hall County Board of Corrections and Hall County Board of Supervisors. Following an evidentiary hearing before the Hall County Grievance Committee (Grievance Committee) and its written decision denying the grievance, Champion filed a petition in error, which the district court dismissed for lack of jurisdiction.

### 1. Disciplinary Action

On January 18, 2019, following an administrative hearing, the director of the Department (Director) disciplined Champion for sending 48 fellow employees a post on social media he had written alluding to a "'story'" he had to tell about the Department's lying to employees' families and tricking them in order to get information and "'what they want.'" This revolved around the Department's attempt to get employees' family members' contact information in order to plan a surprise appreciation project for its officers.

The Director determined that the post sent to fellow employees was in violation of the staff code of conduct provision that states, "Staff shall refrain from participating in the spreading of rumors, innuendo, or other unfounded information which may have a hurtful or negative effect on other employees, the Department or any county agency."

As part of Champion's discipline, he was "removed from transport duty indefinitely effective immediately."

### 2. Management and Disciplinary Rules Under Collective Bargaining Agreement

In taking this disciplinary measure, the Director relied on article 3 of the collective bargaining agreement, which

provided: "All management rights, functions, responsibilities and authority not specifically limited by the express terms of this Agreement are retained by the Employer and remain exclusively within the rights of the Employer."

This article further specified that management rights included, but were "not limited" to,

> [t]he right to direct and arrange working forces including the right to hire, examine, classify, promote or not to promote, train, transfer, assign, and retain employees; maintain discipline and control and use of Department property; suspend, demote, discharge or take other disciplinary action against employees; and to relieve employees from duty due to lack of work, lack of funds, a decision to subcontract or discontinue Department operations or other legitimate reasons.

The rights identified in article 3 "are not in any way intended to be exclusive, but are merely intended to illustrate the rights retained by the Employer."

The Director also relied on article 11 of the collective bargaining agreement, which gives the Director the "full discretion and authority to impose disciplinary action."

Article 11 lists progressive discipline measures that "may be used, depending on the particular situation and severity of the infraction." These begin with an oral warning and end with suspension. They do not specify a restriction from certain duties.

Article 11 provides: "In most instances this procedure shall be followed. However, in instances of flagrant or repeated violations suspension or termination may be used." But article 11 then continues:

> The . . . Director and the Employer reserves [sic] the right to investigate, make judgments, and take appropriate disciplinary action in each individual incident. The level of severity of any infraction and the level and type of discipline to be imposed is solely at the discretion of the . . . Director and the Employer.

### 3. Grievance

Champion did not file a grievance immediately from this disciplinary action. However, he subsequently filed an informal, and later a formal, grievance in relation to the denial of overtime for unarmed transport shifts that the Director denied pursuant to the disciplinary action.

#### (a) General Grievance Procedure Under Collective Bargaining Agreement

Grievance procedures set forth in the collective bargaining agreement state that they must begin with an informal resolution process involving a problem-solving meeting. If the aggrieved party is not satisfied with the response from the informal resolution process, the aggrieved party may submit the problem, in writing, to the Director, who must respond in writing within 14 days. Thereafter, the aggrieved party may present the appealed grievance to the Grievance Committee. Under the collective bargaining agreement, the Grievance Committee is to consist of two or more members of the Hall County Board of Corrections appointed by the county board chairperson.

#### (b) Factual Allegations

Champion's grievance alleged that on February 1, 2019, an overtime requirement for an unarmed transport position developed and was posted in advance. Champion was the most senior officer to request to work the shift, but was denied the opportunity. At the time of the grievance, Champion had been denied a total of two unarmed transport shifts for which he was the most senior officer to sign up.

#### (c) Overtime Provisions of Collective Bargaining Agreement

Champion asserted that these denials violated article 22, section 7, of the collective bargaining agreement. Article 22, section 7, provides: "When an overtime requirement is

identified in advance, the Department may post the opening and allow staff to sign up. The senior officer will be scheduled and expected to work the overtime."

Champion asserted that the Director lacked the power under the collective bargaining agreement to remove him from transport duty, because the "disciplinary actions" described in article 11 therein referred only to oral warnings, written warnings, suspension without pay, suspensions with pay, and discharge. They did not refer to the removal of what Champion described as "negotiated contractual benefits and rights." Further, Champion asserted that the overtime provision of article 22, section 7, was an express term of the agreement that specifically limited the Director's management rights.

Champion sought to distinguish armed transport postings from unarmed transport officer postings, stating:

> To be sure, [the] Director . . . generally had the right to reassign . . . Champion to a post other than his armed transport post. And, this was a significant change for . . . Champion, who was assigned to the armed transport post following testing and a competitive selection process. By assigning . . . Champion back to a non-transport post, [the] Director . . . placed . . . Champion in the same position as other officers who are not armed transport officers; and all of those other officers not assigned as armed transport officers have the right to work unarmed transport officer overtime shifts based upon seniority.

Champion also thought it arbitrary and capricious to deprive him from working as an unarmed transport officer, because it had no logical relationship with the actions for which he was disciplined.

### (d) Director's Denial of Grievance

On March 15, 2019, the Director denied the formal grievance. The Director noted that transport duty is considered to be a "'plum'" position that was appropriate to take away in light of the seriousness of Champion's inappropriate behavior.

And other overtime, not involving transport duties, was still available to Champion.

### 4. GRIEVANCE COMMITTEE REVIEW

Champion and the FOP appealed to the Grievance Committee and sought a hearing pursuant to article 8, section 4, of the bargaining agreement.

### (a) Committee Review Procedures Under Collective Bargaining Agreement

The collective bargaining agreement sets forth that the Grievance Committee shall consist of two or more members of the Hall County Board of Corrections appointed by the county board chairperson. A meeting of the Grievance Committee shall take place in a timely manner after the notice of appeal, and it shall furnish the aggrieved party of its disposition in writing within 14 days.

The agreement further states: "At a grievance hearing held at the request of an employee," certain procedures "will be used." These include that the hearing will be conducted by an attorney who will serve as the hearings officer, who "will be responsible for insuring that the evidence is presented in an orderly fashion and that all participants are treated with respect." The aggrieved party shall present evidence first, with the employer able to ask questions of the aggrieved party or the aggrieved party's witness at the end of the aggrieved party's presentation. The employer shall then present evidence, and the aggrieved party may ask questions of the employer or its witnesses. Both parties shall designate one person to speak on their behalf and to ask questions of the other party or witnesses, and the parties may give a brief statement summarizing their respective positions at the end of the presentation of all the evidence. The Grievance Committee "shall not ask questions but may, through the Hearings Officer, ask for clarification of statements or evidence." At the end of the hearing, the Grievance Committee "shall privately deliberate" before issuing its written decision concerning the grievance.

### (b) Joint Stipulation of Facts

Before the scheduled hearing, the parties filed with the Grievance Committee a joint stipulation of facts. They stipulated that the collective bargaining agreement was in effect and applied to Champion. They stipulated that before January 18, 2019, Champion worked as a corrections officer with the additional duty of armed transport. To qualify to work as armed transport, Champion had been selected through an examination process that included competitive testing and psychological examination. The parties stipulated that on several occasions beginning on or about February 1, Champion was the most senior correctional officer to request to work overtime transport shifts made generally available to the "day shift" officers after the overtime had first been offered to and declined by the armed transport officers. But he was denied the overtime. A total of 76.5 overtime hours were at issue, and the parties agreed as to the rate of compensation for those hours in the event the Grievance Committee found Champion was entitled to them.

### (c) Hearing

The Grievance Committee held a hearing on May 22, 2019. At the hearing, Champion offered exhibit 1, a copy of the stipulated facts, along with its attachments "A" through "D," which represented the collective bargaining agreement, the Director's predisciplinary letter, the final disposition of disciplinary action, and the appeal letter. Champion also offered exhibit 2, which contained emails reflecting denials of overtime. Pursuant to a joint stipulation, the exhibits were received.

Champion called several witnesses, including himself, who were sworn in before testifying at the hearing.

### (i) Champion's Testimony

In addition to the facts stated in the stipulation and the historical facts reflected in the exhibits, Champion testified that from 2010 to 2016, he had been assigned to a full-time transport officer post with the Department. He had to go through

a special interview and training process to qualify for that position, because it entailed carrying a weapon.

After 2016, there was less demand for transport and he was reassigned "back to shift," though he still worked some armed transport duties. Champion explained that as an armed transport officer, an unarmed transport officer sometimes accompanied him. Champion described that there always had to be at least two corrections officers for transports, but only one had to be armed.

### (ii) FOP President's Testimony

The FOP president, a fellow corrections officer, also testified on behalf of Champion. He testified that in his experience as the vice president and then president of the FOP for the prior 5 years, he was unaware of overtime ever being denied as part of a disciplinary action.

### (iii) Director's Testimony

Champion called the Director to testify, who acknowledged that the overtime in question was available to every regular corrections officer on the day shift with the sole exception of Champion. Champion is the only officer the Director has removed from a transport position and the only person whose discipline has involved the denial of overtime related to certain duties.

The Director described that nontransport officers during their regular shifts often do unarmed transport duties. The Director stated that while he considered employment termination as a possible sanction for Champion's behavior, he decided against it. And he was unable to consider a general demotion, because Champion did not hold any rank. He did not believe a suspension to be adequate, because it lasts a short period of time and is soon forgotten. So, the Director decided that the removal from certain duties was an appropriate compromise short of termination of employment and similar to demotion. He wanted to send a message not just to Champion, but to other employees.

While the disciplinary letter did not specifically refer to overtime, the Director saw no distinction between Champion's regular shifts and overtime work in relation to the disciplinary prohibition of working transport. The Director observed that when he suspends an employee, that employee cannot get around the financial consequences of that discipline by working overtime while suspended.

### (iv) Opening and Closing Arguments

Both parties made opening and closing arguments at the hearing.

Champion argued that article 11 of the collective bargaining agreement establishes a scheme of progressive discipline that the Director failed to implement. Further, he argued that article 22, section 7, entitled him, as the senior officer signing up, to posted overtime, without any express exception for disciplinary action. This, he argued, limited the Director's management rights.

Champion asserted that taking away the opportunity to work overtime was not set forth in the bargaining agreement as a disciplinary action and that if overtime could be taken away as a matter of discipline, then so could things such as health insurance or leave time. While Champion acknowledged that the Director had the authority to generally reassign Champion from transport duties, which is an armed transport position, he argued that was different from depriving him of unarmed transport overtime that has been made generally available to day shift corrections officers who are not posted to transport. Such overtime, he said, is merely a "ride along with the armed transport officer."

In its closing argument, the Department summarized that the case came down to "a dispute of two facts," which the Department described as (1) whether the discipline was limited to removing Champion from a transport "post" and (2) what the Director's management rights are.

The Department pointed out that the issue presented was not whether disciplinary action was appropriate, which was

not grieved. The Department described the transport work as involving a lot of free time on the clock, and thus a "plum position." The discipline the Director imposed did not distinguish between armed and unarmed transport and was not limited to a transport "post," which Champion did not in any event have; rather, the disciplinary measure deprived Champion of all transport duties.

The Department argued that the deprivation of the ability to work transport duties, both armed and unarmed, both during regular shifts and overtime, was an "effective way of managing disciplinary problems." The Department asserted that while there was a list in the collective bargaining agreement of some examples of acceptable disciplinary measures, nothing therein limited managerial rights to traditional disciplinary actions. To the contrary, the collective bargaining agreement generally gave the Director sole discretion in determining the level and type of discipline to be imposed. Finally, the Department asserted that the Director acted reasonably in taking away transport duties as a means of imposing discipline akin to demotion.

### (d) Grievance Committee's Decision

The Grievance Committee voted to enter into an executive session, following which the members voted to return to regular session to vote. The Grievance Committee then unanimously voted that the Director acted within his rights pursuant to the bargaining agreement. The Grievance Committee issued a written decision on May 31, 2019, denying the grievance and affirming the Department's denial of the overtime opportunities.

The Grievance Committee described in its decision that the historical facts were not in dispute. And it specifically found no merit to Champion's argument that indefinite suspension violated a progressive disciplinary scheme, noting that under the bargaining agreement, such a scheme was discretionary. The Grievance Committee made no findings regarding the

intent of the parties in entering into the collective bargaining agreement.

The Grievance Committee did, however, suggest that the suspension from transport duty assignments be subject to review by the Director after a specific period of time and that his decision to continue the suspension or terminate employment should be communicated to Champion in writing.

## 5. Petition in Error

Champion and the FOP timely filed a petition in error with the district court for Hall County, filing therewith a praecipe for transcript and bill of exceptions in accordance with Neb. Rev. Stat. § 25-1905 (Reissue 2016). The respondents were named as Hall County, Nebraska; the Department; the Hall County Board of Corrections; and the Grievance Committee (collectively Hall County).

Champion and the FOP assigned as error the Grievance Committee's denial of his grievance in the following respects: (1) failing to properly interpret, apply, and enforce article 22, section 7, of the collective bargaining agreement, which entitled Champion, as the most senior officer, to work the overtime shifts; (2) concluding that the Director had authority under the bargaining agreement to bar an employee from receiving the benefits of article 22, section 7, of the bargaining agreement as a form of "disciplinary action" or "other disciplinary action" under the bargaining agreement; (3) failing to define or interpret the bargaining agreement's phrase "disciplinary action" or "other disciplinary action" in article 3 as limited to traditional forms of disciplinary action, disciplinary actions expressly recognized under the bargaining agreement, and disciplinary actions established by the past practice and custom of the parties (none of which allegedly include the denial of negotiated overtime rights); (4) interpreting the management rights provisions in article 3 of the bargaining agreement as superseding the overtime provisions in article 22, section 7, of the bargaining agreement; (5) failing to give full force and effect to article 3's limiting language that "[a]ll

management rights, functions, responsibilities and authority not specifically limited by the express terms of this Agreement are retained by the Employer and remain exclusively within the rights of the Employer"; (6) interpreting the disciplinary provisions in article 11 of the bargaining agreement as superseding the overtime provisions in article 22, section 7, of the bargaining agreement; (7) concluding that article 11 of the bargaining agreement authorized the Director to bar Champion from working the overtime shifts at issue; and (8) acting in an arbitrary and capricious manner by disregarding the facts and circumstances of the case and the substantive rules of the collective bargaining agreement.

Hall County generally admitted all the factual allegations of the petition that did not involve interpretation of the bargaining agreement. As affirmative defenses, Hall County alleged that the petition failed to state a claim upon which relief could be granted, was barred by the doctrine of unclean hands, and was barred by Champion and the FOP's failure to mitigate damages.

The district court dismissed the petition in error for lack of jurisdiction. The district court observed that review by petition in error under § 25-1901 is for "[a] judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court . . . ." Further, the district court noted that we have said any tribunal, board, or officer exercises a judicial function if it decides a dispute of adjudicative fact or if a statute requires it to act in a judicial manner.[2]

The court reasoned that no statute required the Grievance Committee to act in a judicial manner. And, citing to *Kropp v. Grand Island Pub. Sch. Dist. No. 2*[3] and *Hawkins v.*

---

[2] *Medicine Creek v. Middle Republican NRD*, 296 Neb. 1, 892 N.W.2d 74 (2017).

[3] *Kropp v. Grand Island Pub. Sch. Dist. No. 2*, 246 Neb. 138, 517 N.W.2d 113 (1994).

*City of Omaha*,[4] the district court reasoned that the Grievance Committee did not in this instance decide a dispute of adjudicative fact, because the facts were not in dispute and neither party asserted that the collective bargaining agreement was ambiguous. Instead, the Grievance Committee solely determined questions of law relating to the meaning of the collective bargaining agreement and its application to the undisputed facts. Therefore, the Grievance Committee did not exercise judicial functions.

Champion and the FOP appeal.

## III. ASSIGNMENTS OF ERROR

Champion and the FOP assign that the district court erred (1) in holding it had no jurisdiction over the petition in error, "because the [Grievance] Committee was required, under a bargaining agreement, to conduct an adversarial evidentiary hearing and, in fact, did so," and "in relying upon Kropp v. Grand Island Pub. School Dist. No. 2, 246 Neb. 138, 517 N.W.2d 113 (1994) and Hawkins v. City of Omaha, 261 Neb. 943, 627 N.W.2d 118 (2001) to the extent this Court determines overruling these cases is necessary to reverse the District Court's decision" and (2) "when it assumed, without deciding, that the bargaining agreement is unambiguous and that the [Grievance] Committee was not required to decide an adjudicative fact."

## IV. STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.[5]

---

[4] *Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001).

[5] See *McEwen v. Nebraska State College Sys.*, 303 Neb. 552, 931 N.W.2d 120 (2019).

## V. ANALYSIS

[2,3] The question presented in this appeal is whether the district court had jurisdiction over Champion and the FOP's petition in error. The right of appeal in this state is purely statutory;[6] unless a statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist.[7] Proceedings in error under Neb. Rev. Stat. §§ 25-1901 to 25-1908 (Reissue 2016 & Cum. Supp. 2020) provide a means of judicial review of the judgments and final orders of tribunals exercising judicial functions and inferior in jurisdiction to the district court.[8]

[4] A petition in error in the district court to review a judgment or final order of an inferior tribunal is in its nature an independent proceeding having for its purpose the removal of the record from an inferior to a superior tribunal to determine whether the judgment or final order entered is in accordance with the law.[9] Rather than a "review on appeal" under Neb. Rev. Stat. §§ 25-1911 to 25-1937 (Reissue 2016 & Cum. Supp. 2020),[10] a petition in error is in the nature of a new action, in that a petition in error is required to be perfected, with a summons required to be issued upon the written praecipe of the petitioner in error.[11] The subjects of a review on petition in error and an appeal are so distinctively different and dissimilar that the provisions of the statute relating to each question cannot be taken together and construed as if they were one law and effect given to every provision.[12]

---

[6] *Id*.

[7] *Id*.

[8] *Id*.

[9] *Id*.

[10] See *id*.

[11] See *id*.

[12] *From v. Sutton*, 156 Neb. 411, 56 N.W.2d 441 (1953).

[5,6] At the same time, a petition in error is not a right of action and does not exist at common law.[13] It is a legislatively created method of review.[14] Thus, a petition in error is in a broader sense an appeal, because it is the removal of proceedings from one court or tribunal to another for review.[15] The reviewing court may reverse, vacate, or modify the lower judicial tribunal's judgment or final order for error on the record.[16] In an error proceeding in the district court, that court must look to the transcript of the proceedings of the inferior tribunal filed with the petition in error to ascertain what happened there.[17] Such a proceeding is ordinarily tried on the appropriate and relevant questions of law, set out in the petition in error and appearing in the transcript.[18] A petition in error is designed to review the decision of the inferior tribunal and is not to act as a super legislative or administrative agency to come to an independent conclusion.[19]

The governing petition in error statute, § 25-1901, provides in full:

A judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court may be reversed, vacated, or modified by the district court, except that the district court shall not have jurisdiction over (1) appeals from a juvenile court as defined in section 43-245, (2) appeals from a county court in matters arising under the Nebraska Probate Code or the Nebraska

---

[13] See *McEwen v. Nebraska State College Sys., supra* note 5.

[14] See *id.*

[15] See *id.*

[16] See § 25-1901, § 25-1911, and Neb. Rev. Stat. § 25-2733 (Reissue 2016). See, also, *McEwen v. Nebraska State College Sys., supra* note 5.

[17] *In re Estate of Vance*, 149 Neb. 220, 30 N.W.2d 677 (1948).

[18] *Id.*

[19] *Andrews v. City of Fremont*, 213 Neb. 148, 328 N.W.2d 194 (1982).

Uniform Trust Code, in matters involving adoption or inheritance tax, or in domestic relations matters, or (3) appeals within the jurisdiction of the Tax Equalization and Review Commission.

The parties dispute in this appeal whether the Grievance Committee was "exercising judicial functions." But also necessarily presented is whether the Grievance Committee was any "tribunal, board, or officer . . . inferior in jurisdiction to the district court." Finally, under the plain language of § 25-1901, the Grievance Committee's decision must have been a "judgment rendered" or "final order" for it to be subject to review by a district court under a petition in error.

[7-10] We describe an inferior tribunal, board, or officer's rendition of a judgment or final order in the exercise of judicial functions as being "quasi-judicial."[20] An administrative agency has been said to be a governmental authority, other than a court and other than a legislative body, which affects the rights of private parties through either adjudication or rulemaking.[21] When exercising rulemaking, administrative agencies act in a quasi-legislative capacity.[22] When administrative agencies are called upon to make factual determinations and thus adjudicate, they act in a quasi-judicial capacity.[23] We have explained that when any tribunal, board, or officer is required to conduct a hearing and receive evidence, it exercises "judicial functions" in determining questions of fact.[24] In contrast, if the decision made by any tribunal,

---

[20] See, e.g., *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008); *Nicholson v. Red Willow Cty. Sch. Dist. No. 0170*, 270 Neb. 140, 699 N.W.2d 25 (2005); *Singleton v. Kimball County Board of Commissioners*, 203 Neb. 429, 279 N.W.2d 112 (1979); *Moser v. Turner*, 180 Neb. 635, 144 N.W.2d 192 (1966).

[21] *State ex rel. Stenberg v. Murphy*, 247 Neb. 358, 527 N.W.2d 185 (1995).

[22] See *id.*

[23] See *id.*

[24] See *Medicine Creek v. Middle Republican NRD, supra* note 2.

board, or officer is purely discretionary after an evaluation of facts, it is a decision of policy or a political decision rather than judicial.[25]

[11] One of the considerations for a petition in error is whether the decision being reviewed has taken place in a way that would create a record for meaningful appellate review,[26] but we have explained that a function is not quasi-judicial whenever a hearing is required by statute to ascertain some fact relevant to the performance of a ministerial duty.[27] Instead, a function is quasi-judicial when the law, in words or by implication, commits to any officer the duty of looking into facts, and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial.[28]

No statute contemplates the existence of a Grievance Committee, let alone commits to the Grievance Committee the duty to act in a judicial manner. The County Civil Service Commission Act[29] provides for a civil service commission to hear appeals from any employee who is discharged, suspended, or demoted in rank,[30] and the County Civil Service Act[31] provides there "shall" be a personnel policy board that has the power to review any grievance or case of disciplinary action of a classified service employee.[32] These acts,

---

[25] See *Sarpy Cty. Bd. of Comrs. v. Sarpy Cty. Land Reutil.*, 9 Neb. App. 552, 615 N.W.2d 490 (2000).

[26] See *Hawkins v. City of Omaha, supra* note 4.

[27] See *Singleton v. Kimball County Board of Commissioners, supra* note 20. See, also, *Little v. Board of County Commissioners*, 179 Neb. 655, 140 N.W.2d 1 (1966).

[28] *State ex rel. School Dist. v. Ellis*, 163 Neb. 86, 77 N.W.2d 809 (1956).

[29] See Neb. Rev. Stat. §§ 23-401 to 23-418 (Cum. Supp. 2020).

[30] § 23-411.

[31] Neb. Rev. Stat. §§ 23-2517 to 23-2533 (Reissue 2012 & Cum. Supp. 2020).

[32] § 23-2522(5).

however, do not apply to counties such as Hall County with fewer than 150,000 inhabitants.[33]

Hall County is governed by Neb. Rev. Stat. §§ 23-2534 to 23-2544 (Reissue 2012). Section 23-2534 describes that the county board of any county with a population of less than 150,000 inhabitants "may" adopt policies and procedures pursuant to §§ 23-2534 to 23-2544 which concern employee hiring, advancement, training, career development, position classification, salary administration, fringe benefits, discharge, and other related activities. It also "may" have a personnel policy board that, if established, "shall" review any grievance or case of disciplinary action of a classified service employee when appealed by such employee in accordance with approved personnel rules and regulations and issue a determination that is binding on all parties concerned.[34]

The Grievance Committee is not Hall County's personnel board. Thus, Champion and the FOP do not rely on §§ 23-2534 to 23-2544 for the source of the Grievance Committee's judicial power.

Champion and the FOP instead direct us to the county board's general, statutorily conferred powers to enter into contracts in relation to its concerns[35] and Nebraska's Industrial Relations Act,[36] pursuant to which Champion and the FOP assert the Hall County Board of Supervisors, as the collective bargaining agent,[37] entered into the collective bargaining agreement that specified the adjudicatory procedures utilized. Champion and the FOP then direct us to our prior statement that any tribunal, board, or officer exercises a judicial

---

[33] § 23-2518(2).

[34] § 23-2538(5).

[35] Neb. Rev. Stat. §§ 23-103 and 23-104 (Reissue 2012).

[36] Neb. Rev. Stat. §§ 48-801 to 48-839 (Reissue 2010 & Cum. Supp. 2020).

[37] § 48-838.

function if a statute requires it to act in a judicial manner *or* if it decides a dispute of adjudicative fact.[38]

Hall County does not contest that it had the legislatively conferred power to enter into the collective bargaining agreement, but argues that such conferral was insufficient to establish the Grievance Committee as having a statutory obligation to act in a judicial manner. Relying on the same proposition as Champion and the FOP, Hall County states its decision was not reviewable unless it decided questions of adjudicative facts. Champion and FOP's disagreement centers on whether the Grievance Committee actually decided adjudicative facts.

But we find that the decisive question of appellate jurisdiction is not whether the Grievance Committee decided any question of adjudicative fact. The threshold question is whether the Legislature conferred quasi-judicial power in the first instance. If it did not, then the Grievance Committee's decision, even if of adjudicative facts, was not a judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court.

[12] Our statement referring to deciding a dispute of adjudicative fact *or* a statute requiring an entity to act in a judicial manner has been made in contexts where a law contemplated the tribunal, board, or officer in question. The mere act of deciding a question of adjudicative fact after an evidentiary hearing, when the law has not contemplated the entity and any power to exercise judicial functions, does not render any tribunal's, board's, or officer's decision reviewable in district court by petition in error. That would be an act of self-creation at odds with the concepts set forth in § 25-1901 of judgments, final orders, inferiority in jurisdiction to the district court, and judicial functions.

---

[38] See *Medicine Creek v. Middle Republican NRD, supra* note 2. See, also, *Hawkins v. City of Omaha, supra* note 4.

[13-15] Only when the law, by word or implication, authorizes the judicial function will the result of that exercise be either a "judgment rendered" or "final order" for purposes of § 25-1901. A "judgment" is defined by Neb. Rev. Stat. § 25-1301(1) (Cum. Supp. 2018) as "the final determination of the rights of the parties in an action." The term "action" is a comprehensive one, and is applicable to almost any proceeding in a court of justice by which an individual pursues that remedy *which the law affords*.[39] A "final order" is defined by § 25-1902 as follows:

> (a) An order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment;
>
> (b) An order affecting a substantial right made during a special proceeding;
>
> (c) An order affecting a substantial right made on summary application *in an action* after a judgment is entered; and
>
> (d) An order denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official.

There is no "final order" unless it is made either in the context of an action or a special proceeding. A "special proceeding" occurs where *the law confers* a right and authorizes a special application to a court to enforce the right.[40] A special proceeding includes every special statutory remedy that is not in itself an action.[41]

Entities thus cannot confer upon themselves the power to render a "judgment" or "final order" reviewable by a district court through an action for petition in error. The law must confer it. And the statutes upon which Champion and the

---

[39] *Gibson v. Sidney*, 50 Neb. 12, 69 N.W. 314 (1896) (emphasis supplied).

[40] *In re Claim of Roberts for Attorney Fees*, 307 Neb. 346, 949 N.W.2d 299 (2020) (emphasis supplied).

[41] *Id.*

FOP rely for the conferral of quasi-judicial power upon the Grievance Committee have too tenuous a connection to the Grievance Committee and its designated functions for its decisions to be within the purview of the petition in error statutes. The county's adoption of mandatory adjudicatory procedures in its exercise of a broad, discretionary authority to enter into collective bargaining agreements is not the equivalent of the law conferring a remedy to enforce a right.

We observe that in *Kropp v. Grand Island Pub. Sch. Dist. No. 2*,[42] the statutorily conferred power was the ability to enter into collective bargaining agreements for the administration of grievances arising under the terms and conditions of employment, and we decided that because the school board grievance committee was not required by statute to act in a judicial manner and did not decide a question of adjudicatory fact, there was no petition in error jurisdiction. We also observe that in the case of *Turnbull v. County of Pawnee*,[43] the Nebraska Court of Appeals held that because the county board of commissioners decided questions of adjudicative fact, there was jurisdiction under petition in error to review a decision of the board denying a grievance in accordance with procedures established by a collective bargaining agreement.

We do not view these cases as apposite to the case at bar. There is no statute that the parties direct us to that specifically contemplates, through collective bargaining or otherwise, the determinations of grievances by Hall County employees. And, unlike the Grievance Committee, the Legislature has specifically contemplated boards of commissioners.[44] We disapprove of *Turnbull* to the extent it is inconsistent with this opinion.

[16] We hold that regardless of whether collective bargaining is generally legislatively authorized, the adjudicatory

---

[42] *Kropp v. Grand Island Pub. Sch. Dist. No. 2, supra* note 3.

[43] *Turnbull v. County of Pawnee*, 19 Neb. App. 43, 810 N.W.2d 172 (2011).

[44] See Neb. Rev. Stat. § 23-297 (Reissue 2012).

procedures set forth in a collective bargaining agreement for a committee that was never expressly contemplated by the Legislature do not establish any tribunal, board, or officer inferior in jurisdiction to the district court, which is capable of rendering judgments and final orders in the exercise of judicial functions for purposes of review by petition in error. In such a case, the law, in words or by implication, has not committed to any entity the duty of looking into facts, and acting upon them, after a discretion that is in its nature judicial. Because no statute expressly contemplates the Grievance Committee, its decision was not reviewable by petition in error. Accordingly, the district court did not err when it dismissed the present petition in error for lack of jurisdiction.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.