277 Neb. 25
FORT CALHOUN BAPTIST CHURCH, APPELLANT,
v.
WASHINGTON COUNTY BOARD OF EQUALIZATION, APPELLEE.
No. S-08-108.
Supreme Court of Nebraska.
Filed January 23, 2009.
Milo Alexander and Kevin O'Connell, Senior Certified Law Student, of Abrahams Legal Clinic, Creighton University School of Law, and, on brief, Steven M. Virgil for appellant.
Edmond E. Talbot III, of Talbot & Truhlsen Law Offices, L.L.P., for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

NATURE OF CASE
The Fort Calhoun Baptist Church (Church) leased part of its facilities to the Fort Calhoun Community School District (School). As a result of the lease, the Washington County Board of Equalization (Board) reduced the tax exemption on the Church's property from 100 percent to 80 percent. The Tax Equalization and Review Commission (TERC) affirmed the Board's action, and the Church appeals.

SCOPE OF REVIEW
[1-3] Appellate courts review decisions rendered by TERC for errors appearing on the record. Neb. Rev. Stat. § 77-5019(5) (Cum. Supp. 2006). See City of York v. York Cty. Bd. of Equal., 266 Neb. 297, 664 N.W.2d 445 (2003). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. St. Monica's v. Lancaster Cty. Bd. of Equal., 275 Neb. 999, 751 N.W.2d 604 (2008). Questions of law arising during appellate review of TERC decisions are reviewed de novo on the record. City of York, supra.

FACTS
The Church is a religious organization that meets the requirements to hold property exempt from property taxes. The Church owns real property in Fort Calhoun, Nebraska.
In February 2006, the School, also a tax-exempt organization, began looking for a space to use for a new special education program. At that time, the School's special education students were receiving services in Omaha, Nebraska, and the School sought to provide these services in Fort Calhoun. The School's goals were to meet the educational needs of the students and to save costs associated with contract services and transporting the children to Omaha.
The School researched market rental rates in Fort Calhoun and Blair, Nebraska. The investigation of potential sites revealed there were few suitable facilities in Fort Calhoun. The School identified two potential sites: the Church and St. John's Catholic Church. The School contacted both churches about leasing classroom space. One reason the School was interested in the Church was its proximity to the Fort Calhoun high school. St. John's Catholic Church ultimately determined its facility would not be available for school use.
The Church was reluctant to enter into a lease, and it proposed that the School make a charitable donation to the Church to offset the increase in costs associated with the School's presence. Because the School required a contract, the Church asked the School to make an offer. The Church provided the School with financial statements from the past 3 years to assist the School in setting an amount. In negotiating a contract and monthly rent, the Church's objectives were to ensure the Church did not incur a financial loss as a result of the lease and to demonstrate to the community that it was not "overly benefiting" from the contract with the School.
The Church and the School entered into a facilities use agreement on July 31, 2006, for $1,325 per month including utilities, for 10 months each year for the 2006-07 and 2007-08 school years. After 2 years, the contract was to automatically renew for another school year unless otherwise agreed.
Included in the $1,325 rent were prorated physical upgrade costs. Approximately $5,000 to $7,000 in modifications for handicapped access and fire safety was necessary for the space to meet the fire marshal's requirements. The Church agreed to complete the upgrades, bear the upfront cost of the materials, and donate the pastor's carpentry skills and labor, charging the School a total of $6,000 to be paid in 20 monthly installments of $300. The parties anticipated that the physical modifications to the Church would remain in place after the termination of the lease and that these physical modifications would also benefit the Church.
The Church applied for a 100-percent tax exemption on its real property on November 20, 2006. The Washington County assessor subsequently recommended an 80-percent exemption. The Board concurred with the assessor's recommendation and notified the Church of the valuation change designating 20 percent of the property as taxable. The Church timely protested the valuation, and TERC scheduled a hearing.
At the hearing, the Church presented evidence of rental values for property in Fort Calhoun. It excluded properties that did not include utilities and a warehouse property as not comparable. The properties varied in size, and most were less than 1,000 square feet. The Church identified four comparable properties, added the monthly rents together, divided that number by the total square footage, and multiplied by 71 percent to account for the fact that the School used the property only 5 out of 7 days each week. It calculated a market value of 54.9 cents per square foot.
A representative for the Church stated that in Fort Calhoun, there was a premium on rent for properties over "a certain size." The Church determined that the School rented 2,243 square feet. Using $1,025 as the figure for rent, the Church calculated the rental rate at 45.7 cents per square foot, which it claimed was 9.2 cents below market value.
In its opinion, TERC assigned $1,325 as the rental amount for 3,200 square feet. It calculated the amount of time the School used the property and concluded the actual rental rate was 57.8 cents per square foot. TERC determined market rental values by identifying two properties and calculating the rental price per square foot. One property rented for 45 cents per square foot ($360 -f 800 square feet), and the other rented for 66.7 cents per square foot ($1,600 f 2,400 square feet). The 800-square-foot property with a rental value of 45 cents per square foot per month did not include utilities.
TERC found that the evidence did not support a finding that the Church had leased the property to the School at a below-market rate. As such, it determined that the Church had not met its burden of proving its eligibility for an exemption, because it "failed to demonstrate that the lease of the subject property to the School was for less than market value or that its lease of the subject property to the School represents a contribution of any manner in aid of a charitable, religious or educational use by the School." It concluded the Church had not proved by clear and convincing evidence that the Board's decision was unreasonable or arbitrary, and it affirmed the Board's recommendation of an 80-percent exemption. The Church appeals.

ASSIGNMENTS OF ERROR
The Church claims that TERC erred by not considering the School's educational use of the property in determining whether the property was used for an exempt purpose and that TERC incorrectly determined the lease was for a business purpose.

ANALYSIS
The issue is whether the property leased by the Church to the School was used exclusively for educational, religious, or charitable purposes and, therefore, was exempt from taxation pursuant to Neb. Rev. Stat. § 77-202 (Cum. Supp. 2006).
Neb. Const. art. VIII, § 2, states in pertinent part: "[T]he Legislature by general law may classify and exempt from taxation property owned by and used exclusively for . . . educational, religious, charitable, or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user." Section 77-202 provides:
(1) The following property shall be exempt from property taxes:
....
(d) Property owned by educational, religious, charitable, or cemetery organizations, or any organization for the exclusive benefit of any such educational, religious, charitable, or cemetery organization, and used exclusively for educational, religious, charitable, or cemetery purposes, when such property is not (i) owned or used for financial gain or profit to either the owner or user, (ii) used for the sale of alcoholic liquors for more than twenty hours per week, or (iii) owned or used by an organization which discriminates in membership or employment based on race, color, or national origin. For purposes of this subdivision, educational organization means (A) an institution operated exclusively for the purpose of offering regular courses with systematic instruction in academic, vocational, or technical subjects or assisting students through services relating to the origination, processing, or guarantying of federally reinsured student loans for higher education.
Statutes exempting property from taxation are to be strictly construed, and the burden of proving the right to exemption is upon the claimant. United Way v. Douglas Co. Bd. of Equal., 215 Neb. 1, 337 N.W.2d 103 (1983).
TERC relied upon United Way in affirming the Board's decision. TERC examined whether the lease to the School was a qualified charitable use by the Church. It found that the leased property was used by the Church for religious purposes on weekends, Wednesday evenings, and other times when necessary. TERC found there was no evidence that the School used the property for religious purposes or that the Church made any educational use of the leased premises except in conjunction with its religious use. Because this property was used a significant amount of time by the School for educational purposes, TERC concluded that the Church did not use the property exclusively for a religious use.
Next, TERC examined the amount of rent charged by the Church to determine whether the lease evidenced a charitable use. It considered whether the lease was below the market rate, because the court in United Way had concluded that the lease by United Way of the Midlands (United Way) at less than fair market value was a charitable use. TERC examined comparable leases submitted by the School and concluded that the lease to the School was not at a below-market rate. Because the lease was not below the market rate, TERC found that the lease did not represent a contribution in aid of a charitable, religious, or educational use by the School. Therefore, it concluded that the leased portion of the property was not exempt. TERC affirmed the Board's reduction of the Church's exemption to 80 percent.
For the reasons set forth below, we reverse the judgment and remand the cause with directions to grant the Church a 100percent exemption. Because TERC relied upon our decision in United Way, we examine that opinion in more detail.
United Way was a charitable nonprofit organization that owned real property that was approximately 27,704 square feet. It occupied over half the property and was required to lease the remaining square footage to charitable or nonprofit agencies. The issue was whether the remaining square footage was tax exempt.
United Way leased 5,256 square feet to two other charitable nonprofit organizations, Omaha Council of Campfire Girls (Campfire Girls) and Greater Omaha Community Action (Community Action), for about one-half the fair market rental value of similarly contracted and situated properties. The board of equalization determined that the leased property and the vacant space were subject to taxation. In contrast, the district court held that all the property was exempt from taxation.
In affirming the district court's decision, this court focused upon the market value of the lease in determining whether the leased premises were exempt. This reasoning has created some confusion as to the relevance of the market value or the amount charged for the lease. The court in United Way reasoned that because the lease from United Way to Campfire Girls and Community Action was less than the fair market value, United Way's use of the leased property remained charitable as opposed to a business purpose and was therefore still exempt.
It was not disputed that Campfire Girls' and Community Action's use of the leased space was charitable. This fact should have ended the court's inquiry. Instead, the court examined whether the lease by United Way at less than fair market value was a continued charitable use of the property by United Way.
When the court implicitly rejected the position that ownership and operation of the subject property must coincide in a single legal entity in order for the property to qualify for a charitable exemption, the court should have focused on the use of the property by the lessees. The issue in United Way v. Douglas Co. Bd. of Equal., 215 Neb. 1, 337 N.W.2d 103 (1983), was not whether the lease for less than fair market value was a charitable use by United Way. It was the charitable use of the property by Campfire Girls and Community Action that established the use of the property as being tax exempt.
Although ownership and use of the property may be by different entities, exclusive use of the property for exempt purposes is required. See United Way, supra. It is the exclusive use of the property that must be determined. The term "exclusively" means that the primary or dominant use of the property, and not an incidental use, is controlling in determining whether the property is exempt from taxation. Pittman v. Sarpy Cty. Bd. of Equal., 258 Neb. 390, 603 N.W.2d 447 (1999).
[6] In the case at bar, it is the exclusive use of the property that governs the exemption, and not the market value of the lease. It was not disputed that the Church and the School were organizations qualified to own property exempt from taxation. The issue of financial gain or profit to the owner or user of the subject property was not an issue to be considered by TERC. Property is not used for financial gain or profit to either the owner or user if no part of the income from the property is distributed to the owners, users, members, directors, or officers, or to private individuals. See United Way, supra.
It was undisputed that the property was not used for the sale of alcohol and that neither the Church nor the School discriminated on the basis of race, color, or national origin. Thus, the only issue remaining was whether the Church property was used exclusively for an exempt purpose.
It is the exclusive use of the property that determines the exempt status. See Nebraska Conf. Assn. Seventh Day Adventists v. Bd. of Equalization, 179 Neb. 326, 138 N.W.2d 455 (1965). The Constitution and the statutes do not require that the ownership and use must be by the same entity. Ownership and use may be by separate entities. United Way, supra.
For property to be exempt from taxation, a claimant must prove
"(1) that the subject property is owned by a charitable, educational, religious, or cemetery organization; (2) that the subject property is not being used for financial gain or profit to the owner or user; and (3) that the subject property is being used exclusively for charitable, educational, religious, or cemetery purposes[.]"
[Additionally,] the property cannot be used for the sale of alcoholic liquors for more than 20 hours per week and the property cannot be owned or used by an organization which discriminates in membership or employment based on race, color, or national origin.
Bethesda Found. v. Buffalo Cty. Bd. of Equal., 263 Neb. 454, 458, 640 N.W.2d 398, 402 (2002), quoting Ev. Luth. Soc. v. Buffalo Cty. Bd. of Equal., 230 Neb. 135, 430 N.W.2d 502 (1988).
In Bethesda Found., supra, we referred to a Department of Property Assessment and Taxation regulation dealing with the uses of property. We noted that an exemption was available only if property was
"used exclusively for religious, educational, charitable, or cemetery purposes. The property need not be used solely for one of the four categories of exempt use, but may be used for a combination of the exempt uses. For purposes of this exemption, the term exclusive use shall mean the predominant or primary use of the property as opposed to incidental use. . . ." See 350 Neb. Admin. Code, ch. 40, § 005.03 (1999).
Bethesda Found., 263 Neb. at 459, 640 N.W.2d at 403. The use of the property establishes whether it is exempt. Id.
In this case, the property was being used exclusively for religious or educational purposes. We conclude that the property owned by the Church was used exclusively for religious and/or educational purposes. The School used the fellowship hall, restrooms, and areas for ingress and egress Monday through Friday during school hours, unless the use would interfere with a wedding, funeral, or election. This use was educational and was an exempt use. The remainder of the time, the Church used the property for religious purposes, which was also an exempt use.
The lease of the property by the Church to the School did not create a taxable use. Both of the uses were exempt. The property was used for a combination of exempt uses. TERC was misled by our reasoning in United Way v. Douglas Co. Bd. of Equal., 215 Neb. 1, 337 N.W.2d 103 (1983), when the court considered the market value of the lease to Campfire Girls and Community Action. To the extent that United Way focused on the market value of the lease and not the subsequent use of the property by the lessees, such reasoning is disapproved.
The Legislature, by general law, may classify and exempt from taxation property owned by and used exclusively for educational, religious, or charitable purposes when such property is not owned or used for financial gain or profit to either the owner or user. See Neb. Const. art. VIII, § 2. The Legislature has provided that property owned by educational, religious, or charitable organizations for the exclusive benefit of educational, religious, or charitable organizations and used exclusively for educational, religious, or charitable purposes shall be exempt from property taxes. See § 77-202(1)(d).
The lease by the Church to the School did not create a nonexempt use of the property. The property continued to be used exclusively for religious and educational purposes.

CONCLUSION
Appellate courts review decisions rendered by TERC for errors appearing on the record. § 77-5019(5). See City of York v. York Cty. Bd. of Equal., 266 Neb. 297, 664 N.W.2d 445 (2003). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. St. Monica's v. Lancaster Cty. Bd. of Equal., 275 Neb. 999, 751 N.W.2d 604 (2008). We conclude that TERC's decision did not conform to the law. The property was used exclusively for tax-exempt purposes within the meaning of § 77-202. The primary or dominant use of the property was for religious and educational purposes. There was no evidence to the contrary.
Therefore, TERC's order is reversed and the cause is remanded to TERC with directions to instruct the Board to grant a 100-percent exemption on the Church's property.
REVERSED AND REMANDED WITH DIRECTIONS.
MILLER-LERMAN, J., concurring.
Given the facts of the case, I concur in the result reached by the majority. I would not, however, disregard the potential relevance of the market value or profitability of a lease in all cases, and I see no need to disapprove United Way v. Douglas Co. Bd. of Equal., 215 Neb. 1, 337 N.W.2d 103 (1983), in this regard in this case. I agree that an analysis of "use" by both the claimant-owner and renter is a suitable inquiry relative to the exempt analysis in property tax cases. However, the burden of proving the right to exemption is upon the claimant-owner, id., and, as discussed below, the claimant-owner must show that its use continues to be the use or purpose for which the exemption was granted. I write separately only to express my view that an unnaturally high rent may have implications for exempt purposes, because at some point, the use of the property as a device for generating exaggerated receipts will have bearing on whether the dominant use of the claimant-owner remains for the charitable purpose of the original exemption or will have devolved into an unrelated use.
It has been observed elsewhere that the generation of excess revenues, even from exempt activities, can jeopardize an organization's property tax exemption, but will not result in loss of exempt status so long as, upon analysis, those revenues are reinvested into the expansion and maintenance of the organization. See St. Margaret Seneca Place v. Board, 536 Pa. 478, 640 A.2d 380 (1994). See, also, West Allegheny Hosp. v. Bd. of Prop. Assess., 500 Pa. 236, 455 A.2d 1170 (1982); David A. Brennen, The Commerciality Doctrine as Applied to the Charitable Tax Exemption for Homes for the Aged: State and Local Perspectives, 76 Fordham L. Rev. 833 (2007); Andras Kosaras, Federal Income and State Property Tax Exemption of Commercialized Nonprofits: Should Profit-Seeking Art Museums Be Tax Exempt?, 35 New Eng. L. Rev. 115 (Fall 2000). While not a perfect analogy, this analysis is similar to the examination employed with respect to the unrelated business income tax, I.R.C. §§ 511 through 515 (2000), wherein income tax may be imposed on an exempt organization's unrelated trade or business income, following a determination as to whether the unrelated activity serves the organization's primary exempt purpose or, to the contrary, is the operation of an unrelated business.
An inquiry regarding the leased portion in a case such as the present one should permit examination into various aspects of the lease and the relationship of the use of the portion in question to the claimant-owner's purpose. See Home of Carlisle v. Bd. of Assessment, 591 Pa. 436, 919 A.2d 206 (2007). I would not conclude that the mere fact that both the claimant-owner and renter are exempt organizations ends the inquiry. On the facts of this case, given the modest rent charged, the portion in question is obviously not used as an unrelated business vehicle serving as a revenue stream to finance an endeavor different from that for which the property tax exemption was granted. I, therefore, agree with the majority that the claimant-owner was entitled to its property tax exemption without a reduction.