Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/15/2024 10:20 AM CDT

- 216 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

A & P II, LLC, et al., appellants, v. Lancaster
County Board of Equalization, appellee.

___ N.W.3d ___

Filed March 15, 2024.    No. S-23-296.

1. **Jurisdiction: Appeal and Error.** A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law.

2. ____: ____. It is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.

3. **Statutes: Appeal and Error.** The right of appeal in this state is clearly statutory, and unless the statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist.

4. **Actions: Final Orders.** Quasi-judicial actions that are interlocutory, incomplete, provisional, or not yet effective are not final.

5. **Judgments: Words and Phrases.** Every direction of a court or judge, made or entered in writing and not included in a judgment, is an order.

6. **Actions: Words and Phrases.** An action is any proceeding in a court by which a party prosecutes another for enforcement, protection, or determination of a right or the redress or prevention of a wrong involving and requiring the pleadings, process, and procedure provided by statute and ending in a judgment.

7. ____: ____. Every other legal proceeding other than an action, by which a remedy is sought by original application to a court, is a special proceeding.

8. **Taxation: Final Orders.** Neb. Rev. Stat. §§ 77-5018 and 77-5019 (Reissue 2018) incorporate the definition of "final order" set forth in Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2022).

9. **Statutes.** Statutes relating to the same subject, although enacted at different times, are in pari materia and should be construed together.

- 217 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

10. **Statutes: Legislature: Presumptions.** The Legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute, courts must consider the preexisting law and any other acts relating to the same subject.

11. ____: ____: ____. Where words in a statute have received a settled construction, the Legislature, in using the same words in a subsequent statute on the same subject matter, must be presumed to have intended to employ them in the same sense.

12. **Statutes: Words and Phrases.** A statutory definition of a term found in one statute may be considered when interpreting that same term as used in a different statute.

13. **Final Orders: Words and Phrases.** A substantial right is an essential legal right, not a mere technical right.

14. **Final Orders.** It is not enough that the right itself be substantial; the effect of the order on that right must also be substantial.

15. **Final Orders: Appeal and Error.** Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter.

16. **Moot Question: Final Orders.** A relevant consideration in determining if an order is immediately appealable as a final order is whether it may be mooted by subsequent developments in the litigation.

17. **Moot Question.** Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.

18. **Actions: Moot Question.** An action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.

Appeal from the Tax Equalization and Review Commission. Appeal dismissed.

Nathan D. Clark, Andrew R. Willis, and Kimberly A. Duggan, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellants.

Patrick F. Condon, Lancaster County Attorney, Daniel J. Zieg, and Delaney A. Baumgartner, Senior Certified Law Student, for appellee.

Michael T. Hilgers, Attorney General, Eric J. Hamilton, and Zachary B. Pohlman for State of Nebraska.

- 218 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

Kari A.F. Scheer, Audrey R. Svane, and Michael D. Matejka, of Woods Aitken, L.L.P., for amici curiae Community Development Resources et al.

Cathy S. Trent-Vilim, of Lamson, Dugan & Murray, L.L.P., for amicus curiae Nebraska Investment Finance Authority.

Sydney L. Hayes and Daniel J. Gutman, of Law Office of Daniel Gutman, L.L.C., for amicus curiae Midwest Housing Equity Group.

Scott Mertz, Jennifer Gaughan, and Mark T. Bestul for amicus curiae Legal Aid of Nebraska.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Freudenberg, JJ.

Freudenberg, J.

## INTRODUCTION

The developers of rent-restricted housing projects appeal a decision of the Tax Equalization and Review Commission (Commission) granting 21 petitions by the Lancaster County Board of Equalization (Board) to determine the assessed values of rent-restricted housing projects named in the petitions by using a professionally accepted mass appraisal method that is different from the income approach mandated by Neb. Rev. Stat. § 77-1333 (Reissue 2018). The Board had not yet fully developed the professionally accepted mass appraisal method it sought permission to use and did not present final valuations of the subject properties. The Commission found that pursuant to the exception set forth in § 77-1333(10), the Board had proved that failing to determine that a different methodology should be used would result in a value that is not equitable and in accordance with the law. However, the Commission stated its decision was not "an approval of the final valuation methodology utilized by the Lancaster County Assessor's office when determining assessed values

- 219 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

for low-income properties for tax year 2023." We dismiss the appeal for lack of appellate jurisdiction.

## BACKGROUND

### PETITIONS

In January 2023, the Board filed 21 petitions with the Commission "pursuant to Neb.Rev.Stat. §77-1333(10)," asking the Commission "to consider the Lancaster County Assessor's alternate methodology of rent restricted housing."

Section 77-1333 governs taxation of rent-restricted housing projects and is intended to "further the provision of safe, decent, and affordable housing to all residents of Nebraska." Section 77-1333(3) states in part, "Except as otherwise provided in this section, the county assessor shall utilize an income-approach calculation to determine the actual value of a rent-restricted housing project when determining the assessed valuation to place on the property for each assessment year." Section 77-1333(8) elaborates that, with certain exceptions, each county assessor, in the county assessor's income-approach calculation, shall use the capitalization rate or rates provided annually by the Rent-Restricted Housing Projects Valuation Committee to the Property Tax Administrator to each county assessor and the "actual income and actual expense data filed by owners of rent-restricted housing projects." However, § 77-1333(10) sets forth an exception to the mandate of using the statutory income approach where the county assessor believes the "income-approach calculation does not result in a valuation of a rent-restricted housing project at actual value"; the Board petitions the Commission "to consider the county assessor's utilization of another professionally accepted mass appraisal technique that, based on the facts and circumstances presented by a county board of equalization, would result in a substantially different determination of actual value of the rent-restricted housing project"; and the Board proves that "failure to make a determination that a different methodology

- 220 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

should be used would result in a value that is not equitable and in accordance with the law."

The respondents are owners of rent-restricted housing projects in Lincoln, Lancaster County, Nebraska. Petitions were brought against the following: (1) A & P II, LLC; (2) Affordable Housing West, L.P.; (3) Pedcor Investments-2010-CXXVI, L.P.; (4) Pedcor Investments-2011-CXXXVII, L.P.; (5) Centennial & O, LLC; (6) City Impact Homes, LLC; (7) Creekside Village, Ltd.; (8) Cyrilla Crown, LLC; (9) Glenbrook Townhouses Associates LP; (10) Liberty Estates, LLC; (11) Lincoln Action Program Housing Development Corporation; (12) The Lincoln ALF, Ltd.; (13) The Lodge Apartments Holdings, LLC; (14) New Heights Community Development Corporation; (15) Old Mill Crown, Ltd.; (16) The People's City Mission Home; (17) Prairie Crossing Limited Partnership; (18) Progress for People II, L.L.C.; (19) Reese Estates, L.P.; (20) Scotts Creek Crown, LLC; and (21) Victory Park, LLC (collectively Respondents). All 21 properties had timely provided annual statements detailing their actual income and actual expense data for the prior year and a description of their land-use restrictions as required by § 77-1333(5).

The petitions alleged that "[u]sing professionally accepted mass appraisal methods, the Lancaster County Assessor has determined that the actual value is substantially different than value derived under the unique method created by §77-1333(8)." The petitions generally set forth that using actual income and actual expenses, as required under § 77-1333(8), results in land values significantly less than using "professionally accepted mass appraisal methods." The petitions did not specify the nature of the professionally accepted mass appraisal method utilized to reach these conclusions. The Board asked the Commission to "determine the actual value of the subject parcels, and other such relief as deemed necessary."

- 221 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

Evidence Before Commission

An informal evidentiary hearing was held before the Commission.

Respondents' witnesses testified that to qualify for low-income housing tax credits under the Internal Revenue Code,[1] each rent-controlled property is bound by a land use restriction agreement (LURA).[2] A LURA restricts the amount of rent that an owner can charge the tenants of a certain percentage of units. A LURA also describes the targeted population for those units, such as elderly, special needs, or family. Finally, a LURA sets forth amenities and supportive services to be provided by an owner to the tenants, such as transportation or medical visits. The income generated by a low-income housing project can vary depending on its targeted population and the supportive services and amenities agreed upon in the LURA.

The duration of a LURA is usually 45 years but can range from 30 to 45 years. A LURA runs with the land, encumbering the housing for the life of the agreement even if it is sold to another party.[3] The tax credits generally are taken in the first 10 years, considered the "credit period."[4] The first 15 years of a LURA is considered the "compliance period," because, during that time, any noncompliance is reported to the Internal Revenue Service.[5] The remaining period of the LURA is the "extended use period."[6] Once the LURA is no longer in place, there is a 3-year "decontrol period" to allow rent-controlled tenants to transition to other housing.[7]

---

[1] 26 U.S.C. § 42 (2018).

[2] See 26 U.S.C. § 42(g) and (h).

[3] See 26 U.S.C. § 42(h)(6)(B)(v).

[4] See 26 U.S.C. § 42(f).

[5] See 26 U.S.C. § 42(i)(1).

[6] See 26 U.S.C. § 42(h)(6)(D).

[7] See 26 U.S.C. § 42(h)(6)(E)(ii).

- 222 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

Up to 75 percent of the funds to build a new low-income housing project comes from selling the tax credits to syndication investors. The tax credits are based on the total eligible costs to build the low-income housing project, minus any market-rate units, and the credit for said total eligible costs is spread over 10 years. Syndication investors pay a discounted, present value price for the future 10 years of payments. Syndication investors usually own 99.99 percent of the project during the first 15 years of the compliance period and then exit and hand it over to a nonprofit organization. Developers have an approximate .0049 percent ownership in the project.

Per the standard agreement, the onus of meeting all requirements of the LURA is on the developer. The remaining funds for the projects come from state and federal funding agencies that impose additional restrictions on the properties. The developer must adopt the most restrictive limitations of all the funding sources.

Respondents' witnesses testified that property taxes are one of the highest annual expenses for a rent-controlled housing project, and the ability to raise rents to make up for an increased tax burden is "virtually nil." Low-income housing projects operate on very thin margins such that it is not uncommon to have a negative cashflow. Respondents' witnesses testified that it is not feasible for developers to provide rent-controlled housing if the housing is taxed at a market rate. Even a normalized methodology utilizing average restrictions and incomes for rent-controlled housing would both "halt future projects in Lancaster County" and "seriously jeopardize the existing ones out there."

The Board presented the testimony of two employees of the Lancaster County assessor's office (Assessor's Office), who explained that they use the filings by rent-controlled housing project owners to determine actual income and actual expenses on an annual basis. Secondarily, however, they produce an estimate of what they consider "actual value." The

- 223 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

Assessor's Office only uses the income approach described in § 77-1333(3) and (8) when the two analyses lead to the same value. Otherwise, they petition under § 77-1333(10) to use an alternate methodology. According to the Assessor's Office, the income approach specified in § 77-1333(3) and (8) rarely or never results in values that correspond to the Assessor's Office's calculation of actual value.

The Board presented evidence of six rent-restricted housing properties that had sold for "higher than the current assessed value," as a way of illustrating that the statutory income approach did not result in actual value. These were not the properties listed in the petitions, and none of the properties were sold within the first 15-year control period. One of the six properties was in a decontrol period at the time of sale, which allowed more rentals to market-based tenants. Another was sold to a tenant and thus was sold free of any LURA or a transition period. The remaining four of the six sales were outside of Lancaster County.

More specific to Respondents' properties, the Assessor's Office found that use of the income approach described in § 77-1333(3) and (8) resulted in "one group of property being valued in total at zero, and the other group of properties being valued with a negative building value such that the land was no longer valued as though vacant and developable to its highest and best use." In other words, the assessed value of each property as calculated under § 77-1333(3) and (8) is less than the market value of the land if vacant and undeveloped (and not subject to a LURA).

Exhibits entered into evidence at the hearing, which exhibits had also been presented to the Board when seeking permission to file petitions with the Commission, demonstrated that out of 26 low-income housing projects considered, the Assessor's Office had found under the methodology of § 77-1333(3) and (8) that seven projects had a value of zero, excluding, as required by § 77-1333(3) and (8), the value of the land. These were Reese Estates, New Heights Community

- 224 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

Development Corporation, Liberty Estates, Scotts Creek Crown, Old Mill Crown, Progress for People II, and Curtis Center Housing, L.P. Additionally, two parcels of the City Impact Homes project showed a value of zero.

Because of concerns that the statutory income approach was not rendering actual values for Respondents' properties, the Assessor's Office began to work on a different methodology to value all rent-controlled housing projects in Lancaster County. The Assessor's Office began developing an "income approach using the filings for similarly-situated parcels" rather than owners' actual costs and actual expenses as mandated by the income method described in § 77-1333(3) and (8). This methodology sought to achieve "assessments that are uniform across the class of restricted properties" by utilizing "an equalized typical income and expense level."

The Assessor's Office had not yet settled on the normalized ratios, however. When presenting to the Board, the Assessor's Office had compiled a list of estimated market values for Respondents' properties based on their nonstatutory income approach that used a 45 percent normalized expense ratio, the actual income data, and the capitalization rate established by the valuation committee. By the time of the hearing before the Commission, the Assessor's Office conceded the estimated market values of this document were no longer accurate.

The Assessor's Office was still using actual income in their nonstatutory income approach when it presented to the Board but had decided to also normalize the income by the time of the hearing before the Commission. The normalized income was based on the reporting of the other rent-controlled properties since 2018 and their typical gross income. The Assessor's Office had, in essence, created a "Section 42 submarket" that represents what is typical for such properties. The change to "imputed income" was because it "is more typical with mass appraisal." Furthermore, charitable organizations, such as Progress for People II and Curtis Center Housing, made using reported actual income "problematic."

Other than recognizing the projects were generally subject to restrictions under the "Section 42 program," the Assessor's Office did not compare the restrictions of the properties used to develop the normalized ratios to the restrictions on Respondents' properties at issue at the hearing. The Board was not aware of the Assessor's Office's change from actual income to imputed income.

The Board did not ask the Commission to approve a specific alternate methodology, but, rather, to "allow us to vary from the formula valuation put forward in that statute and to use a method that gets us closer to actual value." Likewise, the Board was not asking the Commission for a "specific set of numbers at this point." That would "be later down the road when the county sets a value for each of these parcels." While, at the time of the hearing, the Assessor's Office was using an "expense ratio" of 52 percent, the normalized percentage, it explained that may end up being different. The Board was asking simply for general "permission to deviate from the actual income and expenses" as specified under the income method under § 77-1333.

The Assessor's Office was unaware of whether a similar normalized methodology had been applied to rent-restricted housing in other counties or elsewhere in the country. Nevertheless, it presented the opinion that its normalized income approach, still under development, complied with professionally accepted mass appraisal standards and the Uniform Standards of Professional Appraisal Practice.

The Assessor's Office explained that using a normalized expense ratio of 52 percent, only eight properties had an "actual value" that was substantially different than the value under the income method specified in § 77-1333. Those eight properties were New Heights Community Development Corporation, Progress for People II, Curtis Center Housing, Reese Estates, Liberty Estates, Scotts Creek Crown, City Impact Homes, and Old Mill Crown. They were the same properties that data presented to the Board had shown as

- 226 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

having a zero value. The Board did not submit updated values to the Commission for the remaining 13 properties subject to the petitions, because, for all but 8 properties, "the [statutory income approach] gets you to actual value." Accordingly, the Board's witnesses told the Commission that the Board was requesting permission to use a different methodology for only these eight projects, and only for the current year.

### Commission's Decision

In its decision, the Commission described that the Board had filed 21 petitions with the Commission "pursuant to . . . § 77-1333(10), seeking permission to use a professionally accepted mass appraisal method, other than the method set forth in § 77-1333, to determine the assessed values of Rent-Restricted Housing Projects." The Commission granted the petitions, holding that for the tax year 2023, the Board had proved that failing to determine that a different methodology should be used would result in a value that is not equitable and in accordance with the law.

The Commission did not state what that different methodology was; nor did it determine the valuation of the properties. The Commission concluded that § 77-1333 did not require the Board to present a specific alternative methodology, but only required the Board to prove that a failure to determine a different methodology should be used would result in a value that is not equitable and in accordance with the law. In granting permission to use a professionally accepted mass appraisal method, the Commission reasoned that the "vast differential between the individualized valuations calculated using the section 77-1333 methodology and the alternative uniform mass appraisal methodology demonstrates that the failure to make a determination that a different methodology should be used would result in a value that is not equitable and in accordance with the law."

The Commission concluded that the grant of the petitions would not prevent the owners from protesting the valuations

- 227 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

that would later be assigned by the Lancaster County assessor (County Assessor). Its decision was expressly not "an approval of the final valuation methodology utilized by the [Assessor's Office] when determining assessed values for low-income properties for tax year 2023."

## Petition for Review

Fifteen of the Respondents jointly filed a petition for review in accordance with Neb. Rev. Stat. § 77-5019 (Reissue 2018). They are A & P II, Affordable Housing West, City Impact Homes, Creekside Village, Cyrilla Crown, Glenbrook Townhouses Associates LP, Liberty Estates, The Lincoln ALF, New Heights Community Development Corporation, Old Mill Crown, Prairie Crossing Limited Partnership, Progress for People II, Reese Estates, Scotts Creek Crown, and Victory Park (hereinafter Developers).

## ASSIGNMENTS OF ERROR

Developers assign that the Commission erred in granting the Board's petitions, because it (1) failed to individually consider each property and the petitions due to the Board's failure to individually consider each property, (2) incorrectly determined that the assessed values of the properties under the actual income and expenses methodology set forth by § 77-1333(8) are inequitable and not in accordance with the law, (3) incorrectly determined that the Board was not required to present an alternative valuation methodology, (4) granted petitions on projects other than the eight properties identified in the Board's evidence and advanced at the hearing, and (5) wrongly permitted the Board to use an income approach modified from that set forth in § 77-1333(8). Developers also assign that the Commission erred in granting relief that was different from what was sought in the petitions and from what was authorized under § 77-1333(10) and (14).

The Board did not cross-appeal.

## STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law.[8]

## ANALYSIS

[2,3] Developers make several arguments as to how the Commission erred in granting permission for the tax year 2023 to use a professionally accepted mass appraisal method other than the income approach set forth in § 77-1333. Before addressing the legal issues presented for review, though, we must ensure we have appellate jurisdiction. It is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.[9] The right of appeal in this state is clearly statutory, and unless the statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist.[10] The Commission is a quasi-judicial tribunal.[11]

The question presented is whether the Commission's order was a "final decision" under the appeal provisions of Neb. Rev. Stat. § 77-5018 (Reissue 2018) and § 77-5019. Section 77-5018(3) provides: "The Tax Commissioner or the Property Tax Administrator shall have thirty days after a final decision of the commission to appeal the commission's decision pursuant to section 77-5019." Section 77-5019(1), in turn, describes the appeal to the Nebraska Court of Appeals of the "final decision" of the commission on a petition, stating in relevant part that "any party aggrieved by a final decision of the commission on a petition, . . . shall be entitled to judicial

---

[8] *Schreiber Bros. Hog Co. v. Schreiber*, 312 Neb. 707, 980 N.W.2d 890 (2022).

[9] *Smith v. Lincoln Meadows Homeowners Assn.*, 267 Neb. 849, 678 N.W.2d 726 (2004).

[10] *Lydick v. Johns*, 185 Neb. 717, 178 N.W.2d 581 (1970).

[11] See *Gage Cty. Bd. v. Nebraska Tax Equal. & Rev. Comm.*, 260 Neb. 750, 619 N.W.2d 451 (2000).

- 229 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

review in the Court of Appeals." Under § 77-5019(2)(a)(i), "Proceedings for review shall be instituted by filing a petition and the appropriate docket fees in the Court of Appeals: (i) Within thirty days after the date on which a *final appealable order* is entered by the commission." (Emphasis supplied.)

Section 77-5019(1) also provides for appeals from "a final decision in a case appealed to the commission," "an order of the commission issued pursuant to section 77-5020 or sections 77-5023 to 77-5028," and a "final decision of the commission appealed by the Tax Commissioner or the Property Tax Administrator pursuant to section 77-701." Section 77-5019(2)(a)(ii) provides "[f]or orders issued pursuant to section 77-5028, within thirty days after May 15 or thirty days after the date ordered pursuant to section 77-1514, whichever is later."

[4] We have not elaborated the meaning of "final decision" under the Tax Equalization and Review Commission Act, and that term is not defined in that act. But under the Administrative Procedure Act, which § 77-5019 was modeled after,[12] we have held that to invoke judicial review, that decision must be "final."[13] We have explained that quasi-judicial actions that are interlocutory, incomplete, provisional, or not yet effective are not final.[14]

[5] We have recently read another administrative statute's description of the right to appeal a "final decision" as incorporating the rules of appealability in civil matters, including Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2022).[15] In civil matters generally, pursuant to Neb. Rev. Stat. § 25-1911

---

[12] See *McLaughlin v. Jefferson Cty. Bd. of Equal.*, 5 Neb. App 781, 567 N.W.2d 794 (1997).

[13] *Purdie v. Nebraska Dept. of Corr. Servs.*, 292 Neb. 524, 872 N.W.2d 895 (2016).

[14] See *Van Fossen v. Board of Governors*, 228 Neb. 579, 423 N.W.2d 458 (1988).

[15] See, *In re Interest of T.W.*, 314 Neb. 475, 991 N.W.2d 280 (2023); *In re Interest of K.C.*, 313 Neb. 385, 984 N.W.2d 277 (2023).

- 230 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

(Reissue 2016), in order for an appellate court to acquire jurisdiction of an appeal, there must be a final judgment or a final order entered from the tribunal from which the appeal is taken. Pursuant to Neb. Rev. Stat. § 25-1301 (Cum. Supp. 2022), a judgment is the final determination of the rights of the parties in an action. Every direction of a court or judge, made or entered in writing and not included in a judgment, is an order.[16]

[6,7] A "final order" is defined by § 25-1902 as (1) an order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment; (2) an order affecting a substantial right made during a special proceeding; (3) an order affecting a substantial right made on summary application in an action after a judgment is entered; and (4) an order denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official. There is no "'final order'" unless it is made in the context of either an action or a special proceeding.[17] An action is any proceeding in a court by which a party prosecutes another for enforcement, protection, or determination of a right or the redress or prevention of a wrong involving and requiring the pleadings, process, and procedure provided by statute and ending in a judgment.[18] Every other legal proceeding by which a remedy is sought by original application to a court is a special proceeding.[19] A special proceeding occurs where the law confers a right and authorizes a special application to a court to enforce it; it includes every special statutory remedy that is not itself an action.[20]

---

[16] *Paxton v. Paxton*, 314 Neb. 197, 989 N.W.2d 420 (2023).

[17] *Champion v. Hall County*, 309 Neb. 55, 76, 958 N.W.2d 396, 411 (2021).

[18] *Schreiber Bros. Hog Co. v. Schreiber, supra* note 8.

[19] *Id*.

[20] See *id*.

- 231 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

[8-12] We find that §§ 77-5018 and 77-5019 incorporate the definition of "final order" set forth in § 25-1902. Statutes relating to the same subject, although enacted at different times, are in pari materia and should be construed together.[21] The Legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute, courts must consider the preexisting law and any other acts relating to the same subject.[22] And where words in a statute have received a settled construction, the Legislature, in using the same words in a subsequent statute on the same subject matter, must be presumed to have intended to employ them in the same sense.[23] A statutory definition of a term found in one statute may be considered when interpreting that same term as used in a different statute.[24]

We have repeatedly referred to § 25-1902 as defining what is a "final appealable order,"[25] which is the same term used in § 77-5019(2)(a)(i). Although §§ 77-5018 and 77-5019 use the term "final decision," rather than "final order," such "decision" could not be considered a "judgment," because it is made in a quasi-judicial proceeding rather than through an action in a court of law. The Commission's decision is an "order" issued in a special proceeding. Thus, "final decision" and "final order" are interchangeable under these statutes.

[13-15] Whether the Commission's decision was final depends on whether it affected a substantial right, since the

---

[21] See *Lang v. Sanitary District*, 160 Neb. 754, 71 N.W.2d 608 (1955).

[22] *Sun Ins. Co. v. Aetna Ins. Co.*, 169 Neb. 94, 98 N.W.2d 692 (1959). See, also, *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012); *Evan S. v. Laura H.*, 31 Neb. App. 750, 990 N.W.2d 27 (2023).

[23] See *Kendall v. Garneau*, 55 Neb. 403, 75 N.W. 852 (1898).

[24] *Kozal v. Nebraska Liquor Control Comm.*, 297 Neb. 938, 902 N.W.2d 147 (2017).

[25] See, e.g., *Tegra Corp. v. Boeshart*, 311 Neb. 783, 976 N.W.2d 165 (2022); *In re Estate of Beltran*, 310 Neb. 174, 964 N.W.2d 714 (2021); *Big John's Billiards v. State*, 283 Neb. 496, 811 N.W.2d 205 (2012).

- 232 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

other three forms of final order as defined by § 25-1902 do not apply to these quasi-judicial proceedings. We have explained that a substantial right is an essential legal right, not a mere technical right.[26] Further, it is not enough that the right itself be substantial; the effect of the order on that right must also be substantial.[27] Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter.[28]

An order affects a substantial right when the right would be significantly undermined or irrevocably lost by postponing appellate review.[29] If the right affected would not be significantly undermined by delaying appellate review, then the order falls under the general prohibition of immediate appeals from interlocutory orders.[30] This general prohibition operates to avoid piecemeal appeals arising out of the same set of operative facts, chaos in trial procedure, and a succession of appeals in the same case to secure advisory opinions to govern further actions of the trial court.[31]

[16-18] Thus, a relevant consideration in determining if an order is immediately appealable as a final order is whether it may be mooted by subsequent developments in the litigation.[32] Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.[33] An action becomes moot when the issues initially presented in

[26] *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. 226, 922 N.W.2d 739 (2019).

[31] *Id.*

[32] *Tegra Corp. v. Boeshart, supra* note 25.

[33] *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022).

- 233 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.[34]

The Commission noted that the grant of the petitions would not prevent the owners from protesting the valuations that would subsequently be assigned by the County Assessor. Further, its decision expressly was not "an approval of the final valuation methodology utilized by the [Assessor's Office] when determining assessed values for low-income properties for tax year 2023." We have exercised appellate jurisdiction over appeals from the Commission's decisions respecting final valuations of property,[35] a property's exempt status,[36] and the raising or lowering of the valuation of a class or subclass of real property to achieve equalization under Neb. Rev. Stat. §§ 77-5023 (Cum. Supp. 2022) to 77-5028 (Reissue 2018).[37] But we have never addressed the merits of an appeal from an order that merely grants permission to use a method of valuation different from the statutory income approach, without yet approving the specific different methodology to be used or the valuations of the subject properties under that methodology.

---

[34] *Chaney v. Evnen*, 307 Neb. 512, 949 N.W.2d 761 (2020).

[35] See, e.g., *Lincoln Cty. Bd. of Equal. v. Western Tabor Ranch Apts.*, 314 Neb. 582, 991 N.W.2d 889 (2023); *Lancaster Cty. Bd. of Equal. v. Moser*, 312 Neb. 757, 980 N.W.2d 611 (2022); *Wheatland Indus. v. Perkins Cty. Bd. of Equal.*, 304 Neb. 638, 935 N.W.2d 764 (2019).

[36] See, e.g., *Upper Republican NRD v. Dundy Cty. Bd. of Equal.*, 300 Neb. 256, 912 N.W.2d 796 (2018); *Harold Warp Pioneer Village Found. v. Ewald*, 287 Neb. 19, 844 N.W.2d 245 (2013); *Fort Calhoun Bapt. Ch. v. Washington Cty. Bd. of Eq.*, 277 Neb. 25, 759 N.W.2d 475 (2009); *St. Monica's v. Lancaster Cty. Bd. of Equal.*, 275 Neb. 999, 751 N.W.2d 604 (2008).

[37] See, e.g., *County of Webster v. Nebraska Tax Equal. & Rev. Comm.*, 296 Neb. 751, 896 N.W.2d 887 (2017); *County of Douglas v. Nebraska Tax Equal. & Rev. Comm.*, 296 Neb. 501, 894 N.W.2d 308 (2017); *County of Franklin v. Tax Equal. & Rev. Comm.*, 296 Neb. 193, 892 N.W.2d 142 (2017); *Dodge Cty. Bd. v. Nebraska Tax Equal. & Rev. Comm.*, 10 Neb. App. 927, 639 N.W.2d 683 (2002).

- 234 -

Nebraska Supreme Court Advance Sheets
316 Nebraska Reports
A & P II v. LANCASTER CTY. BD. OF EQUAL.
Cite as 316 Neb. 216

By expressly declining to approve a valuation methodology or valuations, the Commission created the possibility that its decision could be rendered moot. Under the Commission's order, the County Assessor could use any methodology; thus, the County Assessor could have ultimately assessed some or all of Developers' rent-restricted properties at a value equal to that calculated under the statutory income approach, which would deprive Developers of a case or controversy. Alternatively, the order presently before us would be rendered moot if the County Assessor ultimately assessed some or all of Developers' properties at a value greater than that calculated under the statutory income approach, those values were challenged by Developers, and the Board or the Commission refused to approve them. Either situation would render a decision on the merits of this appeal advisory.

While Developers' right to have their properties assessed under the income approach as mandated by § 77-1333(3) may be substantial, the effect of the present order on that right was not. There is no irrevocable harm to Developers in permitting the County Assessor to try out some unspecified different methodology that the Commission has not yet approved and can evaluate later. The Commission's order was incomplete and provisional. Developers' asserted right to have their properties assessed under the statutory income approach can effectively be vindicated through an appeal from the Commission's approval of final valuations—*if* it is given. We are not at this time expressing an opinion on whether the Commission was correct in concluding that the use of a different valuation methodology was necessary pursuant to the exception set forth in § 77-1333(10). Because Developers' substantial rights have not been affected by the order they have appealed, we lack appellate jurisdiction.

## CONCLUSION

Because we lack appellate jurisdiction, we dismiss the appeal.

Appeal dismissed.

Papik, J., not participating.